### BOSTON TOWBOAT CO. v. DARROW–MANN CO.

### ADAMS et al. v. SAME.

(Circuit Court of Appeals, First Circuit.   November 29, 1921.)

Nos. 1491, 1492.

1. **Shipping ⬡209(3)—Sinking of loaded barge at dock held due to want of attention by master.**

    Findings of the trial court that the sinking of a barge at a dock, some hours after she had been loaded with coal, was due to the failure of her master to remain on board and give attention to her pump, and that the company loading her was not responsible therefor, because the loading was properly done in accordance with the directions of the master, *held* sustained by the evidence.

2. **Shipping ⬡208—Owner held barred by privity from right to limitation of liability for sinking of unattended barge.**

    A finding that the owner of a barge, which sank at a dock because her master left her unattended at night after loading with coal, was not entitled to limitation of liability on the ground that it had knowledge of a custom of its masters to so leave their vessels, though contrary to instructions, *held* supported by the evidence.

3. **Shipping ⬡208—Privity or knowledge of assistant manager of towboat company held that of the company.**

    Privity or knowledge of the assistant manager of a towboat company, who, though not an officer of the company, had the charge and management of its boats, of a custom of its barge masters to leave them unattended at night, while lying loaded in docks, *held* the privity or knowledge of the company.

Appeals from the District Court of the United States for the District of Massachusetts; James M. Morton, Judge.

Suits in admiralty by the Boston Towboat Company and by Charles F. Adams and others, against the Darrow-Mann Company. Decrees for respondent, and libelants appeal.   Affirmed.

For opinion below, see The Bessie J., 268 Fed. 66.

Edward E. Blodgett and Foye M. Murphy, both of Boston, Mass. (Blodgett, Jones, Burnham & Bingham, of Boston, Mass., on the brief), for appellants.

Harry Le Baron Sampson, of Boston, Mass. (Hutchins & Wheeler, of Boston, Mass., on the brief), for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

JOHNSON, Circuit Judge.   The first of these actions is a petition for limitation of liability by the Boston Towboat Company, as owner of the barge Bessie J., and the second is a cross-libel by the trustees of the Boston Towboat Company to recover damages occasioned by the improper loading of the barge by the Darrow-Mann Company and its failure to properly care for her after she was loaded.

[1] On the afternoon of March 5, 1917, the Bessie J. was towed to the wharf of the Darrow-Mann Company in Charlestown, Mass., where she was to be loaded by that company with coal, which was

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to be carried to the wharf of Batchelder Bros., also in Charlestown. On board of her at that time was a master, Capt. Pendleton, whose duties, as testified by Capt. Nickerson, assistant manager of the Towboat Company, were—

"to take care of his barge, see that she was loaded properly, report any accident, any damage to her in any way and keep his barge in proper shape to take cargo."

The loading of the barge was commenced about 3 o'clock and continued until about 5 o'clock p. m., when about 175 tons had been placed in her two after hatches. Work was then discontinued until the night gang came on and Capt. Pendleton, master of the barge, went to his home in East Boston for the night, leaving no one in charge of the barge, although there was testimony that he was told that the loading would be completed that night. The night crew of the Darrow-Mann Company completed the loading of the barge about 9 o'clock that night, by putting aboard of her about 400 tons of coal, making, with what had been loaded in the afternoon, about 575 tons, which was within her carrying capacity. She lay at the wharf of the Darrow-Mann Company until about 6:30 o'clock the next morning, when she sank stern first. Before she sank, a tug was sent by the Boston Towboat Company to take her in tow, and Capt. Pendleton came over on it. He saw the Bessie J. before she sank, and there was testimony that he said that she was properly loaded and stated that he could see no reason for her sinking. Protest was made to the insurance companies, in which it was stated that the cause of the sinking was unknown. The barge was not raised until the afternoon of May 12, 1917. The cost of raising and repairs is the subject of the suit by the trustees of the Boston Towboat Company, while the obstruction of their dock by the sunken barge is the basis of the claim of the damage claimant, the Darrow-Mann Company.

The District Court found that the proximate cause of the sinking of the barge was the failure of the master, Capt. Pendleton, to stay aboard of her after she was loaded; that she was equipped with a gasoline pump of sufficient capacity to have prevented her sinking, if there had been any one aboard of her to operate it; that the loading was done in accordance with instructions of her master, whose duty it was to have remained aboard his barge while she was being loaded and after the loading was completed; that while the placing of 175 tons of coal in her two after hatches, when her forward hatches were empty, might have strained the barge and caused her to leak, yet, as this was done under instructions of the master, the Darrow-Mann Company was relieved of all liability therefor, and the libel of the trustees was ordered to be dismissed.

There was evidence tending to show that, after Capt. Pendleton left his barge unattended, the night crew of the Darrow-Mann Company completed the loading in accordance with his instructions, by placing no coal in the two forward hatches, which gave her stern the necessary drag to cause water to run to her gasoline pump.

The Bessie J. was originally a schooner built in 1879, and convert-

ed into a barge in 1912. She had been used for some time as an outside barge, and then as a lighter in New York Harbor, and later about Boston Harbor. She had been aground and her whole stern rebuilt. She had also received quite extensive repairs in 1914 and in 1916. There was evidence tending to show that she had leaked badly on several different occasions. She was an old vessel, and when loaded needed watching. Capt. Pendleton had been on her for several years and should have known that it was unsafe to leave her, when loaded, with no one aboard. While the Darrow-Mann Company had a watchman who made the rounds of its wharf every hour, it was no part of his duty to go aboard the Bessie J. and examine her condition. She was loaded deeply, and he testified that there was nothing unusual in her appearance, which attracted his attention, although he saw her only a short time before she sank.

The members of the night gang, who completed the loading of the barge, testified that they saw no evidence of her being in a leaky condition. The dock where she lay was lighted by three electric lights, and her hold, which was continuous, and not separated by divisions into hatches, could be distinctly observed from the dock, by those upon the dock, as well as by the man who was aboard of her when she was being loaded. The leak must have been very gradual, for she did not sink until about 10 hours after the loading had been completed, so that it is not strange that the watchman who patroled the wharf saw nothing unusual in her appearance, and we find nothing in the evidence which made it the duty of the Darrow-Mann Company to place a watchman aboard of her.

The finding of the District Court that the loading of the barge was done under the direction of her master, and that the Darrow-Mann Company was not responsible for it, is sustained by the evidence, as well as the further finding that the proximate cause of her sinking was due to the fact that she was left unattended after being loaded.

[2] Upon the petition for limitation of liability the District Court has found that the barge was seaworthy for the limited purpose for which she was used. The fact of her unexplained sinking, in view of her age and history, raises some doubt as to her seaworthy condition, even for the purpose for which she was used about Boston Harbor; but we concur in this finding, as well as the finding that she should not have been left unattended after being loaded. Whether, when she was so left by Capt. Pendleton, it was without the privity or knowledge of the managing officers of the Boston Towboat Company, is primarily a question of fact, and the finding of the District Court upon this, if not clearly wrong, should not be reversed. Most of the testimony was oral, and the court below had the opportunity of judging the credibility of the witnesses from their appearance.

[3] It is assigned as error that the court erred in finding that the Boston Towboat Company's fleet manager knew or should have known that, notwithstanding instructions to the contrary, its barge captains were likely to leave their vessels at night while in Boston. It is insisted in argument that Capt. Nickerson was not a managing officer of the Boston Towboat Company, and that, even if with his privity and

knowledge the master remained away from his barge overnight, this would not be the privity and knowledge of the Towboat Company.

Edward Page, the vice president of the Towboat Company, testified that he himself was purely an executive officer, and in regard to Capt. Nickerson's duties he testified:

"He had the managing of the entire fleet, the employing of the men, and directing the boats, and watching the upkeep of the boats and doing all the duties that a manager would be supposed to do."

Capt. Nickerson also testified that he was told that he would assume charge of all the floating property of the Towboat Company as assistant manager. The evidence discloses that he was a managing officer of the Towboat Company. Although he was not a corporate officer, his privity or knowledge would be that of the company. Eastern S. S. Corp. v. Great Lakes D. & D. Co., 256 Fed. 497, 168 C. C. A. 3; In re P. Sanford Ross, 204 Fed. 248, 122 C. C. A. 516; The No. 6, 241 Fed. 69, 154 C. C. A. 69; The Benjamin Noble (D. C.) 232 Fed. 382, 397; In re Jeremiah Smith & Sons, 193 Fed. 395, 113 C. C. A. 391; In re Old Dominion S. S. Co. (D. C.) 115 Fed. 845, 850.

The evidence discloses that, because of trouble in collecting insurance, Mr. Page gave directions that there should be a master aboard every barge when lying at the dock loaded, and that there was a provision in all of the insurance policies that barges should have a master aboard of them. No extra pay, however, was allowed the masters for performing this duty, and no additional men were hired for this purpose. It appears, also, from the testimony that upon the smaller barges there were no sleeping quarters, and the rule was not enforced as to them. Neither was it enforced when the larger barges were lying at the wharf unloaded; nor when any of the barges, whether loaded or unloaded, were at the wharf of the Towboat Company in East Boston.

Mr. Page, finding that masters could not always be relied upon to remain upon their barges, even when loaded, tried to get the insurance companies to omit this provision from their policies, but had been unable to do so. There was also testimony that Capt. Pendleton upon different occasions, when his barge was loaded and lying at the wharf, had not remained upon it for the night.

Capt. Nickerson testified as follows:

"Q. Whether or not you have ever known of any practice of your men leaving lighters when they were loaded and going home at night?

"A. We rarely have our lighters loaded in any other place, with the exception of our plant at Everett; and when they are loaded there, they are always taken away from there as soon as they are loaded and taken to our East Boston yard. We knock off work at the Everett plant at 5 o'clock. We generally finish up—have our lighters there loaded before that time, so we can bring them down to our own yard. It is hardly ever our lighters go away to load at somebody else's dock."

He also testified that, while the working hours of the masters aboard lighters were from 7 to 5 o'clock, if the loading of the lighter at Everett was not completed at 5 o'clock, he expected the master to stay on the lighter until she was taken down to the East Boston yard. At the East

Boston yard the Towboat Company had a watchman, and when loaded barges were tied up there masters were not accustomed to stay aboard of them, as the watchman on its wharf looked after them.

After the Bessie J. had received 175 tons of coal, there was testimony tending to show that Capt. Pendleton telephoned to the office of the Towboat Company, asking permission to go to his home at East Boston to remain that night, and that he went away, stating that he had received permission to do so.

The master of the tug Peter W. French, belonging to the company, was notified on the afternoon of March 5th that the Bessie J. would be loaded and ready to be moved the next morning, and was directed to get her early in the morning, so that he could get through the bridge over the Mystic river at the 7 o'clock opening of the draw. Capt. Pendleton, the barge master, came over on the tug the next morning; but no explanation was given as to how he was informed that the tug was going after his barge. The tug reached the barge, which was then afloat, but her deck awash, about 6:30 o'clock. Capt. Pendleton had died before the trial; but there was testimony that he stated, on the morning after the sinking, that he had permission to leave his barge. There was no direct testimony that Mr. Page, the vice president, or Capt. Nickerson, the assistant manager, had knowledge that the order to masters to remain aboard barges when they were loaded was not complied with, except when they were at their own yard at East Boston, or that either knew that Capt. Pendleton upon this occasion was not to remain upon the barge after she was loaded. But, from the fact that Capt. Pendleton came over on the Peter W. French in the morning, and that he had telephoned to the office for permission to remain at his home the night before, and that none of the barge masters received extra pay for remaining on their barges over night when loaded, and no additional men were employed for this purpose, that the Towboat Company had no system of following up their masters to see that they did remain aboard their barges, and that the masters did not stay aboard their loaded barges when at the Towboat Company's yard, the learned judge of the District Court drew the inference that Nickerson must have had knowledge that the provision in the insurance policies was not being complied with, nor the instructions given by the vice president, Mr. Page. Whether these instructions were being complied with or not was primarily a question of fact. We cannot say that this inference was not justified by the evidence, nor that it was clearly wrong. The fact that Capt. Pendleton, who had been employed for several years as a barge master, after he had been told that the loading of the Bessie J. was to be completed that night, telephoned for permission to remain at his home, and that he came over on the tug, with no attempt to hide the fact that he had not been aboard the barge, lends strong support to this inference.

The decree of the District Court in both cases is affirmed, with costs to the appellee in this court, and the actions are remanded to the District Court for further proceedings not inconsistent with this opinion.