In the matter of the complaint of the UNITED STATES of America, Appellant,

for exoneration from or limitation of liability as owner of the Coast Guard Vessel, CG 40427,

v.

STANDARD OIL COMPANY OF CALIFORNIA, Appellee.

In the matter of the complaint of the UNITED STATES of America (etc.), Appellee,

v.

STANDARD OIL COMPANY OF CALIFORNIA, Appellant.

In the matter of the complaint of STANDARD OIL COMPANY OF CALIFORNIA, Appellant,

for exoneration from or limitation of liability as owner of the tugboat "Standard No. 4," and the barge "S.O.C.O. No. 18."

v.

UNITED STATES of America, Appellee.

Nos. 72–1040, 72–1120 and 72–1121.

United States Court of Appeals, Ninth Circuit.

April 18, 1974.

912

Allan J. Weiss (argued), Admiralty & Shipping Section, U. S. Dept. of Justice, San Francisco, Cal., for appellant-cross appellee.

Noble K. Gregory (argued), of Pillsbury, Madison & Sutro, San Francisco, Cal., for appellee-cross appellant.

OPINION

Before KOELSCH, BROWNING and CHOY, Circuit Judges.

CHOY, Circuit Judge:

Standard Oil Company of California (Standard) and the United States each filed petitions in the district court seeking exoneration from, or limitation of, liability for the results of a disastrous gasoline fire in San Francisco Bay. Jurisdiction in personam for these petitions was based on 46 U.S.C. §§ 181–195 (1970) providing for the limitation of a vessel owner's liability, and the Admiralty Act, *id.* §§ 741–752 and Public Vessels Act, *id.* §§ 781–790 which afford the same remedies against the United States as against private carriers. Following a court trial on the Government's petition, the district court, sitting in admiralty, issued a final decree determining both parties to be equally and mutually at fault in causing the fire. The United States appeals from this judgment, while Standard cross-appeals from a later decree denying it contribution from the United States for certain claims filed only against Standard. We affirm the district court's determination of mutual liability, but reverse its decision denying Standard any right of contribution.

*Facts*

On the evening of September 26, 1966, Standard's Barge No. 18 was loaded at the company's refinery in Richmond, California with some 989,730 gallons of various grades of gasoline. Standard's Tug No. 4 was then brought into position and secured to the stern saddle of the barge for departure from Richmond to Pier 64 in the Central Basin area of San Francisco Bay where the gasoline was to be off-loaded at the Standard storage area. Between 10:45 and 11:00 p. m. as the vessels arrived at Central Basin, Tug No. 4 had mechanical difficulty in reversing its engines which prevented it from navigating and stopping in the usual manner. This forced the master of the tug, Captain Autiere, to ground the barge on an abandoned launching ramp in the southwest corner of the basin. An angle iron and drift pins attached to pilings at the ramp

punctured the No. 1 port tank of the barge, and gasoline began to leak into the waters of the bay. The tug failed in its attempts to extricate the barge.

Sometime beween 11:00 and 11:30 p. m. that evening, the radio operator on duty at the United States Coast Guard's Captain of the Port office heard a message over the "tug circuit" about a gasoline spill in the bay. The "tug circuit" is a private radio communications circuit utilized by various tug and barge operators in San Francisco Bay. The Captain of the Port has equipment to monitor this circuit, as well as to communicate over it in case of emergency to control vessels. This circuit is in addition to the Coast Guard's own radio circuit which the Captain of the Port uses to communicate with other Coast Guard stations in the bay area. The radio operator reported the information concerning the spill to the Coast Guard duty officer, who took no action at that time.

About ten minutes later, the Captain of the Port's office received a telephone call reporting a gasoline leak from Standard's Tug No. 4 in the Central Basin. After the San Francisco Fire Department was notified, Chief Petty Officer Day, the duty officer representing the Captain of the Port, ordered Coast Guard patrol boat CG 40427, which was docked at a nearby pier, to go into the area to investigate. CG 40427, a 40-foot steel-hulled utility vessel equipped with two water cooled diesel engines, was under the operational command of the Captain of the Port. Arriving in the Central Basin about 12:05 a. m., Coxswain Bush, who was in command of the vessel, noticed that the Fire Department was already at the scene on Pier 64 with a fire truck and firemen spraying the surface in order to break up the gasoline. The concentration of gasoline was extremely heavy by then, with pronounced fumes and vapor rising like a fog some three feet from the surface. This situation was reported by radio to Officer Day, who then ordered CG 40427 to proceed to the nearby Bethlehem Shipyards and stop the continuing of

any burning operations. When this was accomplished, Day ordered the patrol boat to investigate the cause and magnitude of the spill. CG 40427 proceeded over the gasoline-covered surface alongside the tug and barge. Coxswain Bush went aboard the barge, determined the amount of gasoline lost from the No. 1 port tank—eventually some 25,000 gallons—and that all other tanks appeared intact. After reporting these facts to Day, he requested and was given permission to withdraw from the area.

Shortly, the Captain of the Port's office began to have difficulty maintaining radio contact with CG 40427, although the tug circuit remained clear. At 12:34 a. m. Officer Day departed by automobile from his office to the Central Basin to make a personal inspection. He arrived about twenty minutes later and ordered CG 40427 to take him to the stricken barge. The patrol boat again traversed the gasoline-covered waters to the two stranded vessels. Day boarded the barge and discussed with the tankerman the feasibility of transferring gasoline from the ruptured tank to the undamaged tanks. When informed that this could be done in about ten minutes, Officer Day boarded the tug and told Captain Autiere not to attempt to move the barge because of the danger of tearing open the other tanks. Returning to CG 40427, Officer Day ordered it to return to Pier 64.

As Officer Day was leaving the pier by automobile, he noticed that the recently-arrived Standard Tug No. 2 had passed a tow line to the immobilized tug to pull the barge off the ramp. Using his car radio, he ordered CG 40427 to stop Tug No. 2 and to proceed back to Tug No. 4 to obtain the tug captain's name and license number for an oil pollution form. The patrol boat went alongside Tug No. 2 and ordered it not to pull the barge. The tug complied and moved about 75 to 100 yards out of the area. CG 40427 then returned to Tug No. 4 and tied up port side to its starboard quarter with engines left idling. The coxswain boarded the tug to obtain Au-

tiere's license number, but when the captain said he did not have his license there, Bush returned to CG 40427 to radio Day and ask if this information might be telephoned in the morning. Unable to reach Officer Day, Coxswain Bush was just about to step back from his vessel onto the tug when he heard the port engine of CG 40427 accelerate followed by a loud popping noise behind him which sounded like a firecracker. He turned, saw what appeared to be a flame near the port side of his boat where the engine was located, and saw smoke coming from the engine's compartment, then almost instantaneously a burst of flames. In the words of one of the onlooking crewmen aboard Tug No. 2, "then the whole works blew up."

All three crew members of the Standard tug and barge, and two of the three Coast Guard sailors were killed as a result of the fire. Only Coxswain Bush, miraculously, escaped with slight injuries. In addition, there was extensive fire damage to the three vessels and assorted property damage to docks, rafts, floats, piers and other shore property.

Claims were filed against both Standard and the United States in their respective limitation proceedings by the estates of the deceased Standard employees. Claims against only Standard were filed by representatives of the two deceased members of the Coast Guard, Coxswain Bush, and others who sustained property damage. Standard and the United States each filed affirmative claims for losses in the other's limitation proceeding, with Standard in addition seeking contribution or indemnification from the United States. The two limitation proceedings were originally consolidated for trial, but after Standard proposed a settlement with the individu-

al death claimants, the actions were severed and the issue of the Government's liability was tried to the court.

### Government's Contentions

The United States raises several assignments of error: (1) the district court erred in finding that Officer Day was negligent and that CG 40427 was a proximate cause of the fire; (2) the court erred in not finding that Captain Autiere's disobedience of the Coast Guard order not to attempt to move the barge was a supervening proximate cause of the fire; (3) the district court's conclusion that Officer Day was a "managing officer" whose privity or knowledge could impose unlimited liability on the United States is erroneous; (4) the court erred in its computation of damage awards for the estates of the decedents.

### Negligence and Causation

The Government challenges as being clearly erroneous the following findings of fact:

"The court finds that the operation of the patrol boat in the area of gasoline vapors pursuant to the orders of the Captain of the Port was a violation of the standing orders of the Captain of the Port [1] and was negligent. This is true whether the Captain of the Port's standing orders or the normal duty of ordinary care is used as the standard of conduct.

"The court finds by a preponderance of the evidence that the fire was started by some operation of the patrol boat in the area of gasoline vapors, either as a result of the ingestion of gasoline vapors into the air intake system of the port engine, causing

---

1. The Captain of the Port has promulgated an "Organization Book" containing orders for the operation and handling of boats by the Coast Guard, including the CG 40427. One such general order prescribed procedures for investigating oil and gasoline spills on the water and read:

"If dangerous cargo is involved, inform the OOD [officer on duty] of the danger and request him to warn the patrol craft and fireboat to stay well outside the perimeter of the spill area until it is dissipated and made safe.

"If dangerous cargo is involved, do not institute your investigation while fire preventive measures are underway. As soon as all preventive action is completed, start getting information and samples."

a back fire, or by sparking of an exposed electrical contact in the electrical system of the patrol boat."

As appellant recognizes, our standard for reviewing findings of fact made by the trial court sitting without a jury in admiralty, is whether these findings can be said to be clearly erroneous. United States v. Soriano, 366 F.2d 699 (9th Cir. 1966). "A finding is clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed'. . . ." McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954). In making this determination, the prevailing party must be given the benefit of all inferences that may reasonably be drawn from the evidence. United States v. Alaska Steamship Co., 491 F.2d 1147 (9th Cir. 1974); Pacific Queen Fisheries v. Symes, 307 F.2d 700, 706 (9th Cir. 1962).

Appellant contends that Officer Day was not negligent in ordering CG 40427 back to the stranded tug and barge because this decision was made under the extenuating circumstances of an extreme emergency. We disagree. There was no imminent danger once Standard Tug No. 2 ceased its attempts to move the barge. By that time, the vessels had been incapacitated for almost two hours without incident. Short of actually rescuing the Standard crewmen, there was no valid purpose for the patrol boat again going into the area, since any further necessary information could have been obtained by other means, e. g. a relay over the tug circuit. Viewing the evidence in the light most favorable to the prevailing party, Northern Fishing & Trading Co. v. Grabowski, 477 F.2d 1267, 1270 (9th Cir. 1973), we are not definitely and firmly convinced that the district court was mistaken in finding Officer Day to be negligent.

The Government also contends the finding that the patrol boat was a proximate cause of the fire is clearly erroneous because based upon mere conjecture or guess. While it is true that the actual cause of the disaster is unknown, this is often the case when damage results from a fire, simply because of the difficulties inherent in determining the real source. See Minerals & Chemicals Corp. v. S. S. National Trader, 445 F.2d 831 (2d Cir. 1971). However, it is unnecessary, as appellant urges, that the cause be proven by direct evidence. When direct proof of causation is lacking, "the causal connection can be shown by facts and circumstances which, in the light of ordinary experience, reasonably suggests that the [party's] negligence in the manner charged operated proximately to produce the injury." Johnson v. Griffiths S. S. Co., 150 F.2d 224, 226 (9th Cir. 1945); see Meadows & Walker Drilling Co. v. Phillips Petroleum Co., 417 F.2d 378, 382 (5th Cir. 1969). See also Michalic v. Cleveland Tankers Inc., 346 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960). Our view of the record reveals substantial circumstantial evidence, not only in the testimony of Coxswain Bush, but also from other observers, which supports the district court's finding that the patrol boat was a proximate cause of the fire.

### Captain Autiere's Conduct

The Government maintains that Captain Autiere's failure immediately to stem the flow of gasoline from the ruptured tank by transferring it to the undamaged tanks, and his subsequent disobedience of the order not to attempt to move the barge, were negligent acts which constitute supervening proximate causes of the fire. This contention is without merit. By definition, in order to constitute a superseding cause, Captain Autiere's acts must have intervened, or come into active operation, at a time later than some antecedent negligence on the part of the Government, thereby preventing liability for that antecedent negligence. United States v. Marshall, 230 F.2d 183, 190–191 (9th Cir. 1956). See generally W. Prosser,

Law of Torts § 44 at 271 (4th ed. 1971); Restatement (Second) of Torts §§ 440–41 (1965). Here the dispatch of CG 40427, a boat ill-suited for operation in gasoline laden waters, into the danger area for the third time followed Autiere's conduct.

### Limitation of Liability

The United States seeks to limit its liability for damage claims to the amount of its interest in, or the value of CG 40427, because such damage occurred without its privity or knowledge as owner of the vessel. 46 U.S.C. § 183(a) (1970). Supporting this claim for limitation, the Government contends that any negligence of Chief Petty Officer Day, the non-commissioned officer standing duty watch as Captain of the Port, cannot be imputed to it since Day was "[a]cting merely as a representative of his commanding officer [with] duties no higher than that of an ordinary servant or employee . . . ." The district court determined, however, that "[t]he negligence of the United States . . . was that of the duty officer of the Captain of the Port, who for purposes of limitation of liability was a person whose knowledge of or privity to the negligence precludes the United States from entitlement to limitation." Although stated as a conclusion of law by the district court, it is clear that this determination must be considered a finding of fact. Port of Pasco v. Pacific Inland Navigation Co., 324 F.2d 593, 599–600 (9th Cir. 1963); see Coryell v. Phipps, 317 U.S. 406, 411, 63 S.Ct. 291, 87 L.Ed. 363 (1943). As such, we find it to be amply supported by the record.

■■ The same standards are applicable to the United States when it seeks limitation of liability because such was occasioned without its privity or knowledge, as would be the case if a private corporation were seeking the same benefit. See The Midland Victory (Petition of United States), 178 F.2d 243 (2d Cir. 1949); USNS POTOMAC (Petition of United States), 303 F.Supp. 1282, 1304

(E.D.N.C.1969). By necessity in both instances, the requisite privity or knowledge can be attributed to the owner only by the acts of its employees. The significant classification, therefore, is between those employees with sufficient managerial authority to bind the corporate, or in this case governmental owner, as distinguished from those employees having no general powers of superintendence over the whole or a particular part of the business. *Compare* States S. S. Co. v. United States, 259 F.2d 458 (9th Cir. 1958) *with* Petition of Kinsman Transit Co., 338 F.2d 708 (2d Cir. 1964). *See generally* Waterman Steamship Corp. v. Gay Cottons, 414 F.2d 724, 730–731 at n. 14–15 (9th Cir. 1969); 3 Benedict on Admiralty § 490 (6th ed. 1940). In short, the inquiry must focus on whether the negligence is that of "managing officers" or, more properly, "supervisory employees." The title or rank of these employees is, by itself, of limited value in determining on which side of the line a particular case falls. While this may be one factor, "the real test is not as to their being officers in a strict sense but as to the largeness of their authority." Waterman Steamship Co., *supra* at 731, quoting In re P. Sanford Ross, 204 F. 248, 251 (2d Cir. 1913). We conclude that when he was acting as duty officer of the Captain of the Port, Officer Day had sufficient supervisory authority to charge the United States with privity or knowledge of his negligence.

■ As duty officer standing the watch, Officer Day had been delegated full responsibility and authority to manage the office of the Captain of the Port. In this capacity, the utility patrol boats were directly under his supervision and control. Insofar as the men aboard the CG 40427 were concerned, his orders were to be obeyed just as if they came from the Captain of the Port. Indeed, for all practical purposes, he was the Captain of the Port *pro tem* despite his rank in the Coast Guard. Under these circumstances we cannot say that the district court erred in its determina-

tion that his negligence was within the privity and knowledge of the United States as owner of the vessel. *See* States S. S. Co. v. United States, *supra,* 295 F.2d at 474; Great Atlantic & Pacific Tea Co. v. Brasileiro, 159 F.2d 661 (2d Cir. 1947).

### The Damage Awards

■ The district court, after considering the age, life expectancy, number of survivors, earning capacity and personal living expenses of the four Standard employees at the time of their deaths, awarded damages to their representatives. These awards ranged in round figures from $163,000.00 to $211,000.00. The United States now for the first time maintains that the awards are an unwarranted windfall to the families of the deceased because the court failed to make greater allocations for personal living expenses, failed to deduct federal or state taxes, and failed to reduce the awards to their present value. The short answer to these contentions is that we will not reverse the trial court on issues that the record shows were never raised before it. Walker v. Continental Life & Accident Co., 445 F.2d 1072, 1075 (9th Cir. 1971); Union Pacific R. R. v. Johnson, 249 F.2d 674, 677 (9th Cir. 1967).

### Standard's Cross-Appeal

Standard cross-appeals from the district court's order denying its contribution claim against the United States for any amounts paid or to be paid to the various property damage claimants. No contribution is sought for its payments in settlement with the representatives of the two deceased Coast Guard crewmen, or with Coxswain Bush. The district court's denial of Standard's claim, as between joint tortfeasors in this noncollision maritime action, was based upon the Supreme Court's decision in Halcyon Lines v. Haenn Ship Ceiling and Refitting Co., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), and later interpretations of that decision by this court. This question is an open one in this circuit. Nickert v. Puget Sound Tug & Barge, 480 F.2d 1039, 1041 (9th Cir. 1973) (dictum).[2] We conclude that *Halcyon* does not warrant the denial of contribution in this case.

*Halcyon* involved an action by an injured employee of Haenn, a ship refitting company hired to make repairs on a vessel, against the owners of that vessel for negligence and unseaworthiness. Halcyon Lines, the ship's owner, impleaded Haenn charging that it was contributorily negligent in causing the accident. Reversing the lower court's decision which permitted a claim of contribution by Halcyon against Haenn, the Court expressly created an exception to the established admiralty doctrine of apportioning damages equally among mutual wrongdoers. Although the exception is stated broadly to include all noncollision maritime cases, the Court's reasons for denying contribution in that case were narrow. That is, where Congress had expressly immunized Haenn, as an employer of harbor workers, from suits by its employees for tort liability, the Court found it inappropriate, in effect, to evade this congressional policy

---

2. The prior decisions of this court did not require our determination of the question presented here, as to whether contribution is available in a situation in which no statute prevents recovery from a joint tortfeasor. In Amerocean Steamship Co. v. Copp, 245 F.2d 291, 294 (9th Cir. 1957) and Union Sulphur & Oil Corp. v. W. J. Jones & Son, 195 F.2d 93, 94–95 (9th Cir. 1952), we faced the same question presented by *Halcyon* (see text *infra*) of whether an indirect recovery should be permitted where a statute precluded a direct recovery. We there fol-

lowed *Halcyon* and held that it could not. In Simpson Timber Co. v. Parks, 390 F.2d 353, 356 (9th Cir. 1957) and States S.S. Co. v. Rothschild International Stevedoring Co., 205 F.2d 253, 254–255 (9th Cir. 1953), the issues were not ones of contribution but of indemnification. *Halcyon* therefore was not involved, as was noted both in *Rothschild*, 205 F.2d at 255 and in *Simpson Timber*, 390 F.2d at 356, and any reference to this decision merely served the purpose of comparing the related doctrines of contribution and indemnification.

by permitting a right of contribution against Haenn. Since no prior Supreme Court decision required that contribution be granted in noncollision cases, the Court refused to grant such relief in that case. *Halcyon, supra* at 285–287. But see White Oak Transportation Co. v. Boston, Cape Cod & New York Canal Co., 258 U.S. 341, 42 S.Ct. 338, 66 L.Ed. 649 (1922).

We agree with the Fifth Circuit Court of Appeals that regardless of whether *Halcyon* is strictly limited to its facts denying contribution from a joint tortfeasor who is statutorily immune from suit, or whether its broad language concerning all noncollision maritime actions is considered dictum, the *Halcyon* doctrine is inapplicable here. Horton & Horton, Inc. v. T/S J. E. Dyer, 428 F.2d 1131, 1134 (5th Cir. 1970), cert. denied, 400 U.S. 993, 91 S.Ct. 461, 27 L.Ed.2d 441 (1971). In this case, those individuals who suffered property damage filed claims first only against Standard, probably because of the great likelihood that it would be held responsible for such losses. But, had any of these claimants foreseen that the United States similarly would be held liable, undoubtedly they would have made these claims against the Government, just as the representatives of the Standard crewmen did.

This situation is unlike that in *Halcyon* where the injured employee was precluded by statute from suing his employer. Here, the tort liability of the United States was not limited by statute; on the contrary, the Government's immunity has been expressly waived for its negligence in this type of case. Under these circumstances, we see no reason for not requiring the United States to contribute toward the damages resulting from its negligent conduct. Therefore, in this noncollision admiralty case where damages are the result of mutual wrongdoing, we hold that contribution will lie where no statute precludes recovery from the joint tortfeasor against whom contribution is sought. In re Seaboard Shipping Corp., 449 F.2d 132, 138–139 (2d Cir. 1971), cert. denied sub nom. Seaboard Shipping Corp. v. Moran Inland Waterways Corp., 406 U.S. 949, 92 S.Ct. 2038, 32 L.Ed.2d 337 (1972); Horton & Horton, Inc., *supra*; Watz v. Zapata Off-Shore Co., 431 F.2d 100 (5th Cir. 1970).

No. 72–1040 is affirmed.

Nos. 72–1120 and 72–1121 are reversed and remanded.