**In the Matter of the Complaint of Silvio MARTELL and Donald Proietto for Exoneration from or Limitation of Liability as to the Owners of the M/V "LA DOLCE VITA".**

**In the Matter of the Complaint of ROSCIOLI YACHTING CENTER, INC. and Guy Gannett Publishing Co. for Exoneration from or Limitation of Liability as the Owners Pro Hac Vice and Bareboat Charterers of the M/V DONZI Z 33 CROSSBOW VIN # FL8877EK.**

**In the Matter of the Complaint of DONZI MARINE CORPORATION, a Florida Corporation, for Exoneration from or Limitation of Liability as the Owner of the 1987 DONZI Z 33 CROSSBOW.**

Nos. 88–1704–CIV, 88–1735–CIV and 88–6714–CIV.

United States District Court, S.D. Florida.

July 20, 1990.

completely failed in its attempt to establish the existence of such negotiations or circumstances.

Ronald Fitzgerald and Robert L. Spector, Ft. Lauderdale, Fla., for claimants.

Jonathin Fordin, Miami Beach, Fla., for defendants.

## MEMORANDUM OPINION

SCOTT, District Judge.

These proceedings present various claims for an exoneration or limitation of liability pursuant to the Limitation of Liability Act.[1] 46 U.S.C.App. § 181–188 (1958) (originally enacted as Act of Mar. 3, 1851 ch. 43, sec. 3, 9 stat. 635). The Petitioners Roscioli Yachting Center, Inc. ("Roscioli") and Guy Gannett Publishing Co. ("Guy Gannett") are bareboat charterers of the M/V Donzi

---

1. If applicable, this Act allows a bareboat charterer to either obtain an exoneration of liability or a limitation of its liability to the value of the demised vessel and her freight. 46 U.S.C.App. 181 *et seq.*

Z 33 Crossbow.[2] The Respondents Stephen Lamar Barrett and Linda Sue Barrett are the parents of the decedent Sean Barrett. These parties were brought together by an accident which occurred in the Intracoastal Waterway at or near the Dania Beach bridge on July 26, 1987, resulting in the tragic death of Sean.

Subsequently, Stephen and Linda Barrett filed a wrongful death action in the Broward County Circuit Court (Case no. 88–06829–CP). Petitioners responded by filing with this Court their respective applications for exoneration or limitation of liability. Following a hard fought round of pretrial motions and discovery, this case proceeded to non-jury trial on all issues except damages.[3] The Court now enters these findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). We proceed fully cognizant of the depth of emotion that this action must naturally invoke.

## I. FINDINGS OF FACT

1. The Respondents, Stephen Lamar Barrett and Linda Sue Barrett, are the duly appointed Personal Representatives of the Estate of Sean Benjamin Barrett, their deceased son.

2. The beneficiaries of the wrongful death action of Sean Benjamin Barrett include both his estate and his parents.

3. Petitioner, Guy Gannett, was a foreign corporation authorized to do and was doing business in the State of Florida at all times material to the allegations contained herein and was the owner, operator and licensee of radio station WZTA at 94.9 FM a/k/a ZETA 4.

4. Petitioner, Roscioli, was a Florida corporation doing business in the State of Florida at all times material to the allegations contained herein and was the entity which leased the Donzi Crossbow to Guy Gannett.

5. At all times material to the allegations contained herein, Donzi Marine Corporation had owned and manufactured the 1987 Donzi Z 33 Crossbow (hereinafter "Donzi Crossbow") with Hull Identification Number DMRZE098E787 and Dealer Registration Number FL 8877ED with the markings "Bud–Lite—Zeta" on its sides in large painted letters.[4]

6. The Donzi Crossbow was a pleasure craft and a seagoing vessel used by Roscioli and Guy Gannett for commercial purposes. Specifically, Roscioli leased the vessel to Guy Gannett, who in turn used the vessel to promote its radio station and Bud–Lite beer.

7. Roscioli had obtained by direct charter agreement from Donzi Marine Corporation the sole, complete and exclusive right to possess and control the vessel. Having secured this position, Roscioli then subchartered the vessel to Guy Gannett while retaining no rights of possession to itself. Guy Gannett then had the exclusive right to control the Donzi vessel, including time and frequency of operation, destination, provisioning, procurement of insurance, crew selection and maintenance. The only status retained by Roscioli was ultimate responsibility for the vessel's safe return to its owner Donzi Marine Corporation.

8. On Sunday, July 26, 1987, at approximately 4:30 p.m., a tragic boating accident occurred on the Intracoastal Waterway in Broward County. This accident occurred in the vicinity between the Dania Beach Boulevard Bridge and the Dania cut-off canal.

9. The weather conditions existing at the time of the accident were good. It was sunny and clear.

10. Three vessels were players in this accident. The Barrett vessel was heading north. The Donzi Crossbow was also heading north and following the Barrett vessel.

---

2. Silvio Martell and Donald Proietto, owners of the M/V "La Dolce Vita," were also petitioners in this consolidated action, but settled with the Respondents prior to trial.

3. This was agreed to by the parties and the Court prior to trial.

4. Subsequent to the July 26, 1987 accident, Donzi Marine Corporation sold the Donzi Crossbow in question to Pier 75 Dry Rack of Toledo, Ohio.

A third vessel, a Sea Ray, M/V "La Dolce Vita", was proceeding south.[5]

11. The Donzi Crossbow cleared the no wake zone at the Dania Beach Bridge and accelerated to pass the Barrett vessel on the right. As the Donzi passed the Barrett vessel, it was travelling at an excessive rate of speed for the existing conditions, producing a large wake. As a result of this wake, the Barrett vessel capsized.

12. After capsizing, the Barrett vessel immediately sank and Sean Barrett suffered death by drowning.

13. The powerful wake produced by the Donzi Crossbow was one of the proximate causes of the Barrett vessel capsizing.

14. The Donzi Crossbow was seen speeding on the day of the accident and on past occasions during the summer of 1987.

15. On the day of the accident, the operator of the Donzi Crossbow was Captain John James Huard. Captain Huard holds a 100 ton captain's license and has operated sea-going vessels for twenty years. Captain Huard clearly observed the Barrett vessel and should have been aware of the danger of capsizing, given the circumstances. Notwithstanding he proceeded to pass at an excessive rate of speed.

16. On the date of the accident Captain Huard was employed by Guy Gannett to operate the Donzi vessel. In return for his services, Guy Gannett paid Captain Huard an hourly wage of twenty ($20.00) dollars.

17. However, this was not the case with regard to the relationship Captain Huard maintained with Roscioli. On the date of the accident Captain Huard was not acting on behalf of Roscioli.[6]

18. The other occupants in the Donzi vessel were Eugene J. Machael III a/k/a Lee Gillette and Janis Estelle Levy. Gillette was an employee and representative of Guy Gannett's radio station, Zeta 4.

19. The Barrett boat, with Wellcraft decals, was rebuilt and restored by one Ron Weins who sold the vessel to Stephen Lamar Barrett. Barrett bought the vessel at an outdoor boat sale.

20. The Barrett vessel was 19' 81" in length, with a Tuna Tower 7' in width and over 10' in height. In addition, this vessel had limited seating capacity.

21. The Barrett vessel had been used without incident on several occasions prior to the time of this accident.

22. The operator of the Barrett vessel at the time of the accident was Tommy Bailey. Mr. Bailey did not have any marine license nor had he ever taken any safe boating courses.

23. Bailey undertook operation of the Barrett vessel only moments before the accident occurred. Prior to that time, Stephen Barrett had performed all of the navigational responsibilities.

24. Bailey attempted to avoid the wake produced by the Donzi vessel. However, given the amount of alcohol he had previously consumed and his limited boating experience, Bailey's options were limited and the accident was inevitable.

25. The seven other occupants on the Barrett vessel included Stephen Lamar Barrett, Linda Barrett, Sean Barrett, Karen Griffith, Charles Griffith, Dale Lewis and Carol Anderson.

26. At no time prior to the accident had there been more than four occupants aboard the Barrett vessel.

27. At the time of the accident, there were two people in the Tuna Tower with a combined weight of approximately 380 pounds. This was the first occasion that two individuals simultaneously occupied the Tuna Tower.

---

**5.** During the course of the trial, all parties meticulously avoided any finger-pointing at the Sea Ray nor requested any specific finding of fault on the Sea Ray by the Court. We therefore see no reason to embark on such a course. *See, Ebanks v. Great Lakes Dredge & Dock Co.,* 688 F.2d 716 (11th Cir.1982); *Drake Towing Co., Inc. v. Meisner Marine Const. Co.,* 765 F.2d 1060,

1068 (11th Cir.1985) ("[I]t is improper for the court to consider in the first instance the liability of a tortfeasor not represented at trial").

**6.** On previous occasions Captain Huard has acted in the capacity of an independent contractor on behalf of Roscioli.

28. The six other occupants aboard the Barrett vessel had a combined weight of approximately 800 pounds.

29. As testified by a defense expert, the tuna tower was not stable, especially given the large number of passengers and their combined weight.

30. Considering the number of occupants aboard the Barrett vessel in conjunction with the stability tests conducted by the various experts, the Court finds that this vessel was unstable for the manner in which it was being used. This instability was one of the proximate causes of the Barrett vessel capsizing.

31. On the day of the accident there was a case of beer and two gallon jugs of wine aboard the Barrett vessel. The beer was consumed by the four men aboard.

32. Two and one half hours after the accident, Bailey's blood alcohol level was determined to be .06 by toxicologist Gene DeTuscan.

33. It was the accepted practice for Captain Huard and other employees and/or agents to use the Donzi Crossbow to promote the interests of Zeta–4 and Bud–Lite beer. In support of this promotion, the crew aboard the vessel would travel the Intracoastal Waterway making scheduled appearances at various restaurants. Once at the restaurant, the crew would distribute Zeta 4 and Bud–Lite promotional gifts to the patrons.

34. Although young Sean was not wearing a life preserver at the time of the accident, the Court finds that this was not a legal cause of the accident. In our view, a life preserver would have made no difference, given the circumstances of the accident. When the vessel capsized, Sean, like his mother, was undoubtedly thrown directly under the hull in the dark, murky waters of the Intracoastal Waterway. The mother testified that she was barely able to locate an air pocket and survive the ordeal. A baby such as Sean had no chance. While the Court does not condone Linda Barrett's failure to reposition the life preserver after leaving the restaurant, we nonetheless conclude that this failure did not contribute to his death.[7]

35. Given the foregoing factual findings (as well as any later supplement), the Court assesses the relative percentages of fault as follows:

a. Roscioli is assessed no percentage of responsibility for the occurrence of this accident.

b. Guy Gannett is assessed responsibility in the amount of 37%.

c. The Barretts are assessed responsibility in the amount of 63%.

While such an assessment can never be made with scientific certainty, we nonetheless feel comfortable in our determination, given the circumstances of this case.

## II. CONCLUSIONS OF LAW

1. This action involves application of the Limitation of Liability Act. 46 U.S.C.App. 181 et seq. Specifically, it involves application of sections 46 U.S.C.App. 183 and 186.[8]

---

**7.** Having thoroughly considered the evidence adduced at trial, the Court is convinced that the Barretts were good, decent and loving parents who erred by assuming that a short boating trip would be uneventful. The inevitable guilt borne by this decision will undoubtedly plague the Barretts for the remainder of their lives. However, the Court is cautiously optimistic that its decision regarding the absence of a life preserver will serve as some form of consolation.

**8.** These statutory provisions provide in pertinent part as follows:

*46 U.S.C.App. 183: Amount of Liability; loss of life or bodily injury; privity imputed to owner; "seagoing vessel":*
(a) The liability of the owner of any vessel, whether American or foreign, ... for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

*46 U.S.C.App. 186: Charterer may be deemed owner:*
The charterer of any vessel, in case he shall man, victual, and navigate such vessel at his own expense, or by his own procurement, shall be deemed the owner of such vessel within the meaning of the provisions of this chapter relating to the limitation of the liability of the owners of vessels; and such vessel, when so chartered, shall be liable in the same manner as if navigated by the owner thereof.

Generally, if applicable, these statutory provisions allow a vessel owner or bareboat charterer to limit its liability for damages arising from an accident involving a demised vessel.

2. Before addressing the merits of this Act, a brief description of the theory and purpose behind its enactment is necessary. This Act was enacted over one hundred and thirty years ago in order to promote the employment of American vessels in seaborne commerce. *American Car. & Foundry Co. v. Brassert*, 289 U.S. 261, 53 S.Ct. 618, 77 L.Ed. 1162 (1933); *Complaint of B.F.T. No. Two Corp.*, 433 F.Supp. 854 (E.D.Pa.1977). However, due to the extraordinary hazards associated with this mode of transportation, Congress felt that this objective could only be achieved by assuring that the maritime entrepreneur's risks would not exceed the amount of his capital investment. *Flink v. Paladini*, 279 U.S. 59, 49 S.Ct. 255, 73 L.Ed. 613 (1929); *See, Note*, "Shipowner's Limitation of Liability" 3 *Colum. J.L. & Soc. Probs.* 105 (1967). Thus, to promote America's burgeoning shipping industry Congress enacted the Limitation of Liability Act. 46 U.S. C.App. 181 *et seq.*

3. To seek the benefits afforded under the Limitation of Liability Act it is necessary, as a threshold, that the party establish itself as either the owner or bareboat charterer of the vessel in question. 46 U.S.C.App. 183 and 186.

4. Certainly, neither Roscioli nor Guy Gannett owned the Donzi Crossbow. Thus, the question becomes whether either entity constituted a bareboat charterer of this vessel.[9]

5. In essence, to create a bareboat charter it is necessary that possession, command and navigation of the vessel be relinquished to the charterer. *Guzman v. Pichirilo*, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962), citing *United States v. Shea*, 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403 (1894); *Gaspard v. Diamond M. Drill-*

*ing Co.*, 593 F.2d 605 (5th Cir.1979); *Irby v. Tokai Lines*, No. 88–6890, 1990 WL 18880 (E.D.Pa.1990) (available on Lexis February 23, 1990). Anything short of such a complete relinquishment is considered a voyage or time charter. *Interocean Shipping Co. v. M/V Lygaria*, 512 F.Supp. 960 (D.Md. 1981).

6. Both the charter agreement existing between Donzi corporation and Roscioli, as well as the sub-charter agreement existing between Roscioli and Guy Gannett constitute bareboat charters in the strictest sense. In this regard, the evidence adduced at trial clearly established that the requisite degree of control was relinquished in both instances.

7. In their charter agreement with Donzi corporation it was provided that Roscioli would acquire the sole, complete and entire right to possession and control of the vessel. This in fact occurred. Having secured this position, Roscioli then subchartered the vessel to Guy Gannett while retaining no rights of control to itself. Guy Gannett thus had, during the pendency of the sub-charter agreement, the exclusive right to control the vessel. This control included, among other things, the vessel's time and frequency of operation, destination, procuring insurance, and crew selection. Accordingly, the manifest weight of the evidence requires that both Roscioli and Guy Gannett be classified as bareboat charterers of the Donzi Crossbow.

8. Having made this determination, an additional two-step analysis is necessary in deciding whether the protection afforded under the Limitation of Liability Act should be invoked in this proceeding. First, the Court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the Court must determine whether the bareboat charterer had knowledge or privity of those same acts of negligence or conditions of unseaworthiness. *Farrell Lines, Inc. v.*

---

9. On this same date the Court has entered a Memorandum Opinion in *The Matter Of The Complaint Of Anheuser–Busch, Inc., For Exoneration From Or Limitation Of Liability* 742 F.Supp. 1143 which provides an extensive analysis of the requisites necessary to establish a bareboat charter.

*Jones*, 530 F.2d 7 (5th Cir.1976); *Keys Jet Ski, Inc. v. Kays*, 893 F.2d 1225 (11th Cir. 1990).

9. Initially, the Barretts bear the burden of establishing that Roscioli and/or Guy Gannett were negligent. *Coryell v. Phipps*, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943); *Hercules Carriers, Inc. v. Claimant State of Florida*, 768 F.2d 1558 (11th Cir.1985); *Farrell Lines, Inc. v. Jones*, 5th Cir.1976); *See also*, G. Gilmore & C. Black, *Admiralty*, section 10–25 (1957). To satisfy this burden the Barretts must establish that their losses were proximately caused by Roscioli's and/or Guy Gannett's negligence or by unseaworthy conditions aboard the Donzi vessel. To prove such causation, the Barretts must show that an act or omission was a cause which in the natural and continuous sequence, unbroken by an intervening cause, produced the results complained of. *See, In the Matter of the Complaint of Moran Towing & Transportation Co.*, No. 86–0320, 1989 WL 167603 (D.Me.1989).

■ 10. As evidenced by the aforementioned factual findings, the Barretts are unable to satisfy their initial burden of establishing negligence or unseaworthiness on the part of Roscioli. Accordingly, Roscioli is entitled to an exoneration of its liability pursuant to the Limitation of Liability Act. 46 U.S.C.App. 181 *et seq.*

11. However, as found above, Guy Gannett was indeed responsible for several contributing factors which brought about this unfortunate accident. Having made this determination of negligence and legal causation on the part of Guy Gannett, the question becomes whether Guy Gannett had privity or knowledge of this negligent conduct.

12. Having established negligence on the part of Guy Gannett, the burden of proof now shifts to this entity to prove lack of privity or knowledge of such negligence. *Verdin v. C & B Boat Co., Inc.*, 860 F.2d 150 (5th Cir.1988); *Petition of M/V Sunshine, II*, 808 F.2d 762 (11th Cir.1987);

*Hercules Carriers, Inc. v. Claimant State of Fla.*, 768 F.2d 1558 (11th Cir.1985); *Tittle v. Aldacosta*, 544 F.2d 752 (5th Cir. 1977); *Coleman v. Jahncke Service, Inc.*, 341 F.2d 956 (5th Cir.1965). That is, Guy Gannett is required to establish by a preponderance of the evidence that it had neither privity nor knowledge of those acts of negligence which caused the loss.

13. In the context of a corporation, privity or knowledge means the privity or knowledge of a managing agent, officer or supervising employee or those to whom the management of a vessel has been delegated or whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred. *See, Coleman v. Jahncke Service, Inc.*, 341 F.2d 956 (5th Cir.1965); *Bates v. Merritt Seafood, Inc.*, 663 F.Supp. 915 (D.S.C.1987).

14. In a limitation proceeding, an owner may not escape liability by giving managerial functions to an employed person acting as its agent whether the person be corporate or otherwise. *The Silver Palm*, 94 F.2d 776 (9th Cir.1938); *Boston Towboat Co. v. Darrow–Mann Co.*, 276 F. 778 (1st Cir.1921); *Petition of Warner–Quinlan Co.*, 10 F.Supp. 28 (D.N.J.) *aff'd*, 78 F.2d 870 (3rd Cir.1935). "The title or rank of these employees is, by itself, of limited value in determining on which side of the line a particular case falls." *United States v. Standard Oil Co. of California*, 495 F.2d 911 (9th Cir.1974). While this may be one factor, the real test is not as to their being officers in the strict sense, but as to the largeness of their authority. *United States v. Standard Oil Co. of California*, 495 F.2d at 917.

15. Given this standard, the Court concludes that Guy Gannett, through its supervisory representatives and employees, was aware or should have been aware of the nature of the activities onboard the Donzi during the period prior to the accident. Representatives of the radio station were always onboard the Donzi when it undertook these promotional ventures.[10] During

**10.** Eugene J. Machael a/k/a Lee Gillette, a disc jockey with Zeta 4, was the employee to whom

management of the promotional enterprise had been delegated to both on past occasions, as

these trips, the vessel engaged in conduct inconsistent with good boating practice, including speeding. Such actions were testified to by independent eye-witnesses. Since officers and representatives of the radio station were onboard the vessel and participated in the conduct, we therefore conclude that Guy Gannett should not receive the benefits of the Act. It had knowledge and privity of the negligent acts. As a result, Guy Gannett is unable to claim the benefits afforded by the Limitation of Liability Act.

### III. LEGAL DETERMINATIONS

Based upon the foregoing findings of fact and conclusion of law, it is ordered as follows:

1. Guy Gannett's petition for a limitation of its liability is DENIED.

2. Roscioli's petition for an exoneration of its liability is GRANTED.

3. The injunction of the state court proceedings previously entered by the Court on September 19, 1988, is hereby lifted. The parties may proceed to a trial on the issue of damages.

4. The Court hereby retains jurisdiction of these consolidated actions for a period of thirty (30) calendar days to either confirm or enforce the terms of this Memorandum Opinion.

5. Within five (5) calendar days from entry of this Order, counsel for the Barretts' shall submit a final judgment consistent with this Memorandum Opinion.

DONE and ORDERED.

well as on the day of the accident. Rather than acquiescing in and encouraging reckless operation of the Donzi vessel, Gillette, as Guy Gan-nett's supervisory representative, should have insured safe and proper operation.