In the Matter of the ADVENTURE BOUND SPORTS, INC. and Andre Smith d/b/a Adventure Bound Sports for Exoneration from or Limitation of Liability.

No. CV 489–274.

United States District Court, S.D. Georgia, Savannah Division.

Nov. 15, 1993.

**1246**

Barnard Portman, Savannah, GA, Matthew W. Monroe, Boca Raton, FL, for petitioners.

Edwin D. Robb, Jr., Savannah, GA, for claimant Laufman.

Jeffrey W. Laskey, Savannah, GA, for claimant Wentzel.

Robert S. Glenn, Jr., Savannah, GA, Frank R. Seigel, Atlanta, GA, for claimant Maclean.

Lawrence B. Lee, Asst. U.S. Atty., Savannah, GA, for movant.

## ORDER AND MEMORANDUM

NANGLE, District Judge.

On June 4, 1989, Paul Wentzel and Warren Seeds were killed while on a recreational deep sea scuba diving trip organized and operated by Adventure Bound Sports, Inc. As a result, petitioners Adventure Bound Sports, Inc. ("Adventure Bound") and Andre Smith d/b/a Adventure Bound Sports ("Smith") filed this Petition for Exoneration from or Limitation of Liability pursuant to 46 U.S.C.A.App. §§ 183–189 (1958) (the "Limitation Act"). Adventure Bound represented that it was the owner of the M/B SEA HORSE, and Smith represented that he was the owner pro hac vice of the SEA HORSE as charterer. The Court issued a monition to all potential claimants ordering them to answer the complaint for exoneration or limitation.

In response to the monition, Barbara Laufman, individually and as natural guardian of Souletta Seeds Laufman, Warren Seeds' daughter, answered the Complaint and filed a claim against the Petitioners for $750,000 in compensation and damages for Seeds' death under the Death on the High Seas Act, 46 U.S.C.A.App. §§ 761–768 (1975) ("DOHSA").[1] Patricia D. Wentzel, individually and as the administratrix of the estate of Walter Paul Wentzel, Jr., answered the Complaint and filed a DOHSA claim against the Petitioners for $1,500,000.00 for Wentzel's death.

The Court bifurcated this case on the issues of liability and damages with the consent of the parties. Accordingly, the Court held a bench trial limited to the issues of exoneration from or limitation of the liability of Adventure Bound and Smith under the Limitation Act. After hearing the evidence, examining the exhibits, pleadings, stipulations,[2] and proposed findings of fact and conclusions of law of the parties, and viewing the SEA HORSE, this Court makes its Findings of Fact and Conclusions of Law as to the right of Adventure Bound and Smith to exoneration from or limitation of liability pursuant to 46 U.S.C.A.App. § 183 et seq.

## FINDINGS OF FACT

On June 4, 1989, Paul Wentzel, Warren Seeds, and three other divers, Richard Sheppard, Charles Lapp, and Diane Ryan, left Savannah, Georgia aboard the SEA HORSE. Captain Robert Meador, who holds a Coast Guard license, was operating the boat and Michael Majer, the certified divemaster for the trip, was on board. The divers planned a drift dive at Snapper Banks, twenty-six miles from the Savannah lighthouse. Shortly before the SEA HORSE arrived at this destination, Meador informed Majer that he

---

1. A cause of action may be brought under DOHSA:

   whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any state.... [T]he personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, ... against the vessel, person, or corporation which would have been liable if death had not ensued.

   46 U.S.C.A.App. § 761.

2. The parties entered into an extensive stipulation of facts, numbering 170, prior to trial. This stipulation, which was of great assistance to the Court, is part of the record herein and is hereby incorporated in and made a part of this Order and Memorandum.

planned to dive that day, leaving Majer to operate the SEA HORSE during Meador's preparation for and diving. Majer did not have a Coast Guard license to operate the SEA HORSE with paying passengers on board.

Upon arriving at the dive site, Meador used standard navigational techniques to determine the position for the dive, and Majer threw a lead-weighted buoy into the water to mark the spot. Meador did not anchor the boat, and he left the engines idling, as was appropriate for a drift dive. Meador then left the helm of the boat to don his gear for the dive.

While Meador was putting on his scuba gear, the boat drifted out of position in relation to the buoy. Majer repositioned the boat so that the buoy would be closer to the dive platform. After Meador gave the command signal, the first dive party—Lapp, Wentzel, Seeds, and Meador—entered the water.

Approximately one minute after the divers entered the water, the remaining passengers heard an unusual "whining" noise coming from the area near the starboard engine. The engines of the boat were idling, and Majer thought that the gear shift was in neutral. Upon investigating, Majer heard the sound of something striking the hull of the vessel, and he shut off the engines. Moments later, a damaged scuba tank and Wentzel's face mask surfaced along the starboard side of the vessel. Majer immediately dove into the water to investigate and found Seeds' body wedged between the starboard shaft and the hull. Majer recovered Seeds' body. He and the other passengers administered CPR and attempted to contact the

Coast Guard. Meador and Lapp surfaced a few minutes later, and swam to the boat.

The Coast Guard arrived approximately one hour later, and transported Seeds to the hospital, where he was pronounced dead on arrival. Later that afternoon, Majer conducted an underwater search and recovered Wentzel's body.

## I.  Decedents

Walter Paul Wentzel and Warren Seeds were servicemen in the United States military. Wentzel was born on March 21, 1960, and died on June 4, 1989. Seeds was born on September 28, 1954, and died on June 4, 1989. Based upon the men's military records and upon witnesses' testimony, the Court finds that both men were good soldiers who proceeded cautiously in dangerous situations.

The abilities of Seeds and Wentzel were sufficient to enable them to safely dive under the conditions at the Snapper Banks dive site. Both men had diving instruction and experience. Wentzel had been certified by the Professional Association of Diving Instructors ("PADI")[3] as an open water diver,[4] and had completed a significant portion of the PADI advanced diver training course. Seeds likewise had received a PADI certificate as an open water diver. On June 4, 1989, Wentzel and Seeds were in good health and were physically and mentally capable of performing the planned scuba dive.[5] Neither man had previously participated in a dive trip organized by Adventure Bound.

## II.  Petitioners

### A.  *Andre Smith; Andre Smith d/b/a Adventure Bound Sports*

Andre Smith is an experienced and competent boat operator who, as a PADI-certified

---

3. PADI, the largest diver training agency in the world, established standards for diver training, trains and certifies instructors, and maintains records of training activities. *See* PADI Dive Manual (authored by Dennis Graver, petitioners' expert witness), Pet'rs' Ex. 32.

   Other instructional diving agencies exist, such as the National Association of Underwater Instructors. *See* Stip. 168. The Court refers to PADI procedures since the divers and divemaster in this case were PADI certified.

4. The basic PADI open water scuba course prepares divers to make repetitive dives to depths of approximately sixty feet. Upon completing the

course, a diver receives a PADI certification card. PADI offers courses beyond the open water diver course, including advanced open water diver, divemaster, assistant instructor, underwater instructor, and open water instructor.

5. The Court finds no credible evidence that Seeds' prior neck injury, for which he underwent surgery on January 25, 1989, at Fort Gordon, Eisenhower Army Medical Center in Augusta, Georgia, rendered him physically incapable of diving or was a factor in this accident in any way.

instructor, routinely trained divemasters at Adventure Bound, a scuba dive shop. Smith, doing business as Adventure Bound Sports, purchased the vessel FISH 'N' FOOL on April 25, 1983 and renamed it the SEA HORSE. Smith determined the policy and procedures to be used by the divemaster, captain and crew when paying passengers were aboard the SEA HORSE.

The evidence clearly indicates that Smith operated Adventure Bound as a sole proprietorship. Smith testified under oath on March 30, 1990, in a deposition for a different case, that Adventure Bound was a sole proprietorship and that he borrowed money under the name "Andre Smith doing business as Adventure Bound Sports." On April 4, 1987, Smith borrowed $33,673.52 from First Union Bank to repair the SEA HORSE and consolidate business debts. First Union Bank issued the loan to "Andre Smith, d/b/a Adventure Bound Sports," rather than to a corporate entity, and Smith signed the loan documents in this manner. Smith signed a collateral note and security agreement, dated April 4, 1987, in a space designated for "Individual Borrower, Proprietorship, Partnership," rather than in a space designated for "Corporate Borrower." Furthermore, a credit application submitted by Smith to Dacor Diving Supplies on July 23, 1989, depicts Smith as the owner of Adventure Bound, a sole proprietorship, and on August 27, 1991, Dacor received a judgment against Andre Smith, d/b/a Adventure Bound Sports, for payment for diving supplies.

Smith paid all taxes for Adventure Bound, and filed all of Adventure Bound's tax returns as part of his personal income tax return. In addition, Smith used Adventure Bound funds to pay his personal bills, as follows: $16,960.57 in January 1989, $6,024.91 in February 1989, and $4,679.14 in March 1989. Smith also paid his April 1989 personal bills with Adventure Bound funds.

### B. *Adventure Bound Sports, Inc.*

Smith filed Articles of Incorporation for Adventure Bound Sports, Inc. on October 1, 1979, at the office of the Georgia Secretary of State. The Articles named Smith as the sole stockholder and chief executive officer of Adventure Bound Sports, Inc. The Secretary of State administratively dissolved Adventure Bound Sports, Inc. on March 3, 1988. After September 1989, the dive shop closed and Smith did not conduct any further business either under the name "Andre Smith d/b/a Adventure Bound Sports," or under the name "Adventure Bound Sports, Inc."

On November 15, 1989, Adventure Bound Sports, Inc. applied to the Secretary of State for reinstatement as a domestic corporation; the office of the Secretary of State reinstated Adventure Bound Sports, Inc. on November 20, 1989. The Court finds that Adventure Bound Sports, Inc. applied for reinstatement in order to file the instant petition for exoneration or limitation from liability, which it filed on December 5, 1989, pursuant to section 185 of the Limitation Act.

### III. Divers and Crew

Majer was the divemaster on the Snapper Banks trip. He received divemaster training in the military, and was certified by the YMCA. Smith converted Majer's YMCA certificate to a PADI certificate and further trained Majer in performing the various divemaster functions on Adventure Bound trips. As part of Majer's divemaster training, Majer accompanied Smith on diving trips where the licensed captain dived. In doing so, Smith tacitly approved and authorized Majer to pilot the vessel and allow the captain to dive when paying passengers were aboard the ship.[6]

Meador, the captain of the SEA HORSE on the date of the accident, was a licensed captain competent to handle the vessel. Majer, the divemaster, also had extensive experience operating vessels; he did not, however, possess a Coast Guard license to operate

---

**6.** Claimants' attorneys referred to this process at trial as "role reversal." Several of petitioners' experts, however, noted that the term "role reversal" technically is inaccurate, since the captain did not become the divemaster. Claimants'

expert, Captain Nicholson, referred to the captain's action in leaving the ship to dive as "role abandonment." For purposes of simplicity, the Court will employ the term "role reversal" to describe this process.

the SEA HORSE with paying passengers on board.

As divemaster, Majer was responsible for performing all divemaster functions on the Snapper Banks trip. While, under PADI requirements, these functions did not include accompanying every group of divers, Majer was required to stand at the back of the vessel and watch the divers descend until they are out of sight.

Richard Sheppard, a diver on the Snapper Banks trip, had passed the PADI open water course, advanced course, rescue diver course, divemaster course, and assistant instructor course. He had known Seeds socially for two and one-half years before the accident, and had dived with Seeds once or twice in Panama. Sheppard was Wentzel's company commander and had known Wentzel for about six months, but had never dived with Wentzel.

Charles Lapp, another diver, was certified as an open water and advanced diver, and had completed the rescue diver and divemaster training. He had made over 200 dives in the United States, in both the Atlantic and Pacific oceans, as well as dives in Central America and the Caribbean. Lapp participated in about twenty-three offshore dives with Adventure Bound, including many trips with Majer, and Majer was familiar with Lapp's strong diving abilities. The Court finds that Lapp was the most skilled diver on the Snapper Banks trip.

Lapp was in the same Army unit as Seeds, Wentzel, and Sheppard, and had once been Wentzel's supervisor. Lapp was Seeds' roommate at the time of the accident, and had arranged the dive. Lapp previously had dived with both Sheppard and Seeds, but not with Wentzel.

## IV. The SEA HORSE

The SEA HORSE is a passenger vessel 33.8 feet in length, 12.8 feet in breadth and 5.3 feet in depth. On the day of the accident, the SEA HORSE was powered by 260 H.P. Caterpillar diesel engines with 1½ to 1 Twin Disc 50 marine gears turning 24–inch propellers. The vessel was seaworthy when it embarked upon the diving trip.

## V. The Diving Trip

On June 4, 1989, Wentzel and Seeds paid Smith, doing business as Adventure Bound Sports, a fee to scuba dive at Snapper Banks, a site twenty-six miles from the Savannah lighthouse. Before the trip, Majer checked each diver's certification cards in accordance with industry standards and norms. The SEA HORSE got underway at approximately 8:00 a.m.

Before the divers arrived at the dive site, Majer gave a dive briefing, which covered diving, entry, exit and descent procedures. Majer did not know at this time that Meador was going to dive. During the briefing, Majer told the divers that the current would assist them in getting from the vessel to the buoy line. The briefing did not include any other information about the direction or velocity of the current.

Majer told the divers to use a giant stride entry toward the buoy, the most appropriate entry method given the design of the SEA HORSE. He instructed the divers to evacuate all the air from their buoy compensator device to ensure that they were negatively buoyant upon entering the water. The divers were to assume immediately a head-down, feet-up position and swim toward the buoy line.

Adventure Bound's policy was to put divers in the water so that they would not have to swim against the current to reach the buoy line. On a current dive, the boat is positioned in relation to the buoy in order to prevent the divers from having to swim to the buoy. It is standard procedure to keep the boat's engines idling in neutral so that divers can be picked up quickly if any problems occur.

Lapp, Wentzel, and Seeds were part of the same dive team,[7] and discussed their own personal dive plan. Seeds and Wentzel told Lapp that they would have problems equaliz-

---

**7.** The PADI manual emphasizes the importance of diving with a buddy, and states that diving should always be done in teams. Defs.' Ex. 32, 30–31, 67. Each buddy must keep track of the other, and only a few feet should separate buddies. *Id.*

ing due to their sinuses and ears, but did not share this vital information with Majer.

A diver must equalize to avoid sinus and ear pain as he descends in the water. One method of equalization is for a diver to put his body in an upright position by kicking his fins and taking a breath. Another method, called valsalva, involves blocking the nose and attempting to exhale through it with the mouth closed. Swallowing and wiggling the jaw from side to side are additional equalization techniques.

A diver can equalize with his head up or down in the water. He need not surface to equalize, and if he equalizes head-down, he also need not reach upward. A diver who cannot equalize, however, must ascend until the pain decreases. All recognized dive courses teach their students to ascend by first looking up over a 360–degree area, reaching up with their arms and hands, and then rising in a controlled manner.

As part of the dive plan arranged with Lapp, Seeds and Wentzel were to descend slowly due to problems clearing their ears and noses. This clearing problem only affected their rate of descent, and in the past had never been so severe as to cause either diver to abort a dive. Lapp told Seeds and Wentzel to meet him at the bottom of the buoy line because he did not have problems equalizing.

Majer instructed Seeds and Wentzel to put on their equipment. He gave them air tanks and personally turned on each diver's air at the main valve. The divers' equipment was functioning properly before they entered the water. Furthermore, the weather conditions were moderate when the SEA HORSE arrived at the dive site, and did not contribute to or cause this accident.

Ten minutes before arriving at the dive site, Meador informed Majer that he was going to dive with Wentzel, Seeds, and Lapp. Meador was not dressed to dive, but instead was wearing a bathing suit, shirt, and shoes. Upon arriving at Snapper Banks, Majer dropped a buoy and anchor to mark the dive site. Meador then turned the boat to the left, came back around to the buoy, and left the helm to don his equipment, leaving Majer operating the vessel's controls from the front of the boat.

Due to the delay that occurred while Meador put on his gear, the vessel drifted out of position and Majer repositioned it downstream of the buoy. The standard procedure in a drift dive is to position the boat up-current of the buoy and allow the divers to enter the water directly above the buoy line. That way, if the divers do not get to the line immediately, they will float toward the buoy. When Majer repositioned the boat, however, the current was moving against the back of the vessel, pushing it away from rather than toward the buoy. Because the SEA HORSE was improperly positioned in relation to the current and buoy, Majer put the engines in reverse to maintain the vessel's position.

A boat is supposed to drift on a current dive, and there is no reason to put the boat in reverse unless the boat is misaligned with the buoy. Since Meador was donning his gear, he did not realize that Majer had misaligned the boat after it drifted out of position. He thus had no reason to suspect that the vessel was in reverse gear.

The divers likewise did not realize that the SEA HORSE was in reverse. Before the dive, Lapp, Seeds and Wentzel sat on the dive platform, and Sheppard stood near the rear of the vessel. When Meador sat down on the platform between Lapp and Seeds, Seeds and Wentzel moved down the platform and sat directly behind the starboard propeller. From his position on the swim platform, Meador had a clear view of the stern of the vessel, the swim platform, and the surrounding area, but could not see the position of the control levers inside the helm. Furthermore, the other divers sitting on the platform would not necessarily have realized that the boat was in reverse, since their wet suits, boots, and fins would have prevented them from feeling water splashing onto the platform, and their masks were designed to direct their vision downward.

Before the divers entered the water, Majer attempted to put the vessel in neutral and did not realize that the starboard engine actually remained in reverse. Captain Billy Mack, the alternate licensed captain of the SEA HORSE who had operated the vessel

"thirty to fifty times," testified that only a slight distinction existed between the reverse and neutral gears on the SEA HORSE, preventing the transmission from automatically disengaging from reverse when the lever appeared to be in a neutral position. The boat operator, therefore, could (and did on this occasion) believe the vessel to be in neutral when it really was still in reverse.[8]

Meador gave the "go signal" for the first dive, although Majer, as divemaster, was responsible for giving the signal. The vessel was idling in reverse gear at that time. Majer remained at the controls when the divers entered the water, rather than fulfilling his divemaster responsibility of watching the divers from the rear of the boat. Only a slight chop, less than one foot, occurred when the divers entered the water. Lapp entered the water first, followed almost simultaneously by the other three divers. Seeds and Wentzel stepped off the platform near the starboard end. The divers could hear the sound of the propeller under the water.

Lapp testified that, as he entered the water, the current was flowing away from, rather than toward, the buoy and did not change direction as Lapp descended the buoy line.[9] Several factors indicated the direction of the current to Lapp. Lapp was looking at the buoy line when he entered the water, and felt the current directly upon his face and the hair rise on the back of his neck. The boat was behind him at this time, and the direction of the current surprised Lapp. Due to the current's direction, Lapp had to kick hard and use more propulsion than usual to reach the buoy line. Lapp also noticed the buoy line moving away from him.

The Court finds Lapp's testimony regarding the direction of the current credible. Lapp was an experienced diver. Furthermore, Officer Tomlinson, the Coast Guard investigator, noted in his deposition that a diver is in a better position to judge the direction of the current than a person standing on the boat.

The Court finds that Seeds and Wentzel were struck by the propellers of the SEA HORSE while they were trying to equalize. The boat's propellers did not strike them immediately after they entered the water, but within thirty to forty-five seconds after their entry. On at least two occasions during his descent to the buoy line, Lapp looked back over his shoulder and saw the silhouettes of three divers descending behind him toward the line, the first time five to ten feet below the surface and the second time an unknown depth below the surface.[10] No one saw Wentzel and Seeds equalize, but since the individual dive plan called for Seeds and Wentzel to equalize and descend slowly, the Court finds that they equalized sometime after Lapp's final glance over his shoulder. When Seeds and Wentzel attempted to equalize by uprighting themselves in the water, approximately ten feet below the water's surface, their heads were only four feet from the surface and the current was pushing them backwards towards the vessel and closer to the surface. The propeller struck Seeds and Wentzel from behind.

Majer claims that he saw Wentzel and Seeds descending and saw their fins below the surface of the water while Sheppard was looking elsewhere. This, however, is impossible, since to see the divers descend Majer would have had to stand either at the swim platform or at the side of the boat. He did neither. Within thirty seconds after the divers entered the water, Majer left the wheelhouse and moved to the middle of the vessel. He asked Sheppard if everything was "okay" and if the divers were down, and the men synchronized their watches. Majer abandoned his divemaster responsibilities in apparent reliance on his personal knowledge of Lapp's extensive diving experience.

Approximately one minute after the divers entered the water, Sheppard and Majer heard an unusual noise, which they discovered to be the driveshaft spinning on Seeds'

8. When Captain Mack heard of the diving accident, he thought that this nuance of the shift lever might have been responsible.

9. The direction of the current was a factor in the accident, since the average swimmer, even wearing fins, would not be able to swim head-on into a current in excess of one knot.

10. The visibility underwater on the date of the dive was approximately sixty feet.

scuba tank. The propeller had already struck the divers when Sheppard and Majer heard this sound. Majer then ran to the wheelhouse and cut off the engine. From the starboard side of the vessel, Sheppard saw Seeds' yellow scuba tank bobbing in the water, and Majer and Sheppard retrieved the tank. Both hoses on the tank were cut, and air spewed out from them. The tank's on/off valve had been knocked off. After finding the tank, Sheppard ran to the front of the boat where he saw Wentzel's mask moving away from the vessel.

Major dove under the boat and saw Seeds' body wedged between the driveshaft and the bottom of the boat. Seeds did not have the regulator in his mouth, and the mesh fish bag he had been holding was wrapped around the boat's shaft. Majer brought Seeds' body on board the boat. Majer later found Wentzel's body along with his weight belt, his BC vest, its bladder completely cut, and his spear gun at the bottom of the ocean. All of the steps taken by Majer after hearing the noise were reasonable and necessary under the circumstances.

At some point after Seeds was brought on board the vessel, Meador came up unassisted, swam to the vessel, and came aboard. When Lapp resurfaced after being underwater seven or eight minutes, he was about 40 yards away from the vessel, and also swam to the vessel unassisted.

## VI. The Coast Guard Investigation

Chief Warrant Officer Roger D. Tomlinson, currently stationed as an instructor at the Yorktown Marine Inspection Investigation School, conducted the Coast Guard investigation of the deaths of Seeds and Wentzel. Tomlinson issued a report to the Coast Guard Commandant on November 11, 1989, which contained his findings of fact, analysis, conclusions and recommendations. The Coast Guard Commandant approved this report on June 6, 1990.

Based on his investigations, Tomlinson concluded that the starboard propeller was turning in reverse at the time it struck and killed Seeds and Wentzel. In reaching this conclusion, he relied on that fact that the boat had a right-handed propeller on which the trailing edges of all the blades were bent. This Court is of the same opinion. Given the direction of the current, had the boat would have moved away from the divers had it been in neutral. A vessel with twin propellers will eventually back up in a circle toward the propeller that is in neutral if the other propeller is in reverse. Based on the position of the boat in relation to the divers and the buoy, the SEA HORSE began to move toward Wentzel and Seeds, indicating that one propeller was in reverse. The starboard propeller struck Wentzel and Seeds while under power and in reverse, killing them.

## VII. Smith's Knowledge of the "Role Reversal"

While Smith was not aware that Meador would choose to dive on the Snapper Banks trip, Smith was aware of the practice of "role reversal" between captain and divemaster on Adventure Bound trips. Smith knew that Meador, the licensed captain of the SEA HORSE, would routinely scuba dive while paying passengers were aboard. Smith also knew that Majer, who did not have a Coast Guard license, had operated the SEA HORSE with paying passengers aboard while Meador dived. Furthermore, Smith through example tacitly authorized Majer to operate the vessel when Meador wanted to dive. Smith's negligent practice of allowing an unlicensed person to operate the vessel while the captain left the boat to dive violates Coast Guard regulations. See 46 U.S.C. § 8903 (Supp.1993) ("A self-propelled, uninspected passenger vessel shall be operated by an individual licensed ... to operate that type of vessel in the particular geographic area, under prescribed regulations.").

On the date of the accident, this "role reversal" set into motion a chain of events resulting in the deaths of Seeds and Wentzel. Meador decided to dive at the last moment, changing the carefully-planned dive only minutes before the divers entered the water. As Meador hurriedly donned his gear, Majer went to the helm of the boat. When the boat drifted out of position, Majer improperly repositioned the vessel in relation to the current and inadvertently left it in reverse rather than neutral. Meador had no knowledge

of this when he, rather than Majer, gave the "go signal." Finally, Majer missed the divers' entry into the water because he was operating the boat. Upon entering the water, Seeds and Wentzel were pushed by the current upward towards the boat and were struck and killed by the boat's starboard propellers.

## CONCLUSIONS OF LAW [11]

This Court has jurisdiction over the subject matter of this case, in admiralty, and over all parties and their claims under 28 U.S.C. § 1333 (1966 & Supp.1993) and 46 U.S.C.App. § 185 (1958 & Supp.1993).

### I. Appropriateness of Limitation of or Exoneration from Liability

Claims brought under DOHSA, such as the instant claim, are subject to the Limitation Act, 3 *Benedict on Admiralty* § 22 (7th ed. 1981), which limits a ship owner's liability for an accident to the value of his vessel, if the owner had no knowledge or privity of the negligence or unseaworthiness that caused the accident. 46 U.S.C.A.App. § 183(a) (1988).[12] The Act rests on the theory that, without privity or fault, "the shipowner is not liable for damages or injury beyond the value of the vessel ... immediately after the casualty." *Guillot v. Cenac Towing Co.*, 366 F.2d 898, 911 (5th Cir.1966). In evaluating the liability of Smith and/or Adventure Bound, therefore, this Court must make two determinations: (1) whether any "acts of negligence or conditions of seaworthiness caused the accident"; and (2) "whether the ship

owner had knowledge or privity of those same acts of negligence or conditions of seaworthiness." *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir.1976).[13]

The owners of the SEA HORSE, Smith and Adventure Bound, bear the burden of proof as to both the issue of negligence and the issue of privity or knowledge in their petition for limitation or exoneration. A ship owner seeking exoneration from liability must show by a preponderance of the evidence that he, his vessel, and his crew are free from fault. *Hercules Carriers, Inc. v. Claimant State of Fla.*, 768 F.2d 1558, 1582 (11th Cir.1985); *In re Caribbean Sea Transp.*, 748 F.2d 622, 666, *modified on other grounds*, 753 F.2d 948 (11th Cir.1985); *In re Tittle*, 544 F.2d 752, 755 (5th Cir.1977). In contrast, a claimant usually must prove fault in an action for limitation of liability before the burden of proof shifts to the petitioner to show a lack of privity or knowledge. *See Coryell v. Phipps*, 317 U.S. 406, 409, 63 S.Ct. 291, 292, 87 L.Ed. 363 (1943); *Hercules Carriers*, 768 F.2d at 1564. The "Pennsylvania rule" of admiralty law, however, imposes a rebuttable presumption that the violation of a statute intended to prevent collisions is a contributing cause of an accident, *The Pennsylvania*, 86 U.S. (19 Wall) 125, 130, 22 L.Ed. 148 (1874), thereby placing the burden of proof as to negligence and causation on the party seeking limitation rather than on the claimant. *Orange Beach Water, Sewer & Fire Protection Auth. v. M/V ALVA*, 680 F.2d 1374, 1380–81 (11th Cir.1982).[14]

---

11. The Court has made detailed findings of fact concerning the accident. To the extent that these findings of fact also constitute legal conclusions, they are incorporated herein.

12. The Limitation Act can encompass sporting charter vessels. *See In re Tittle*, 544 F.2d 752 (5th Cir.1977) (analyzing accident that occurred on chartered sport fishing boat under Limitation Act).

Congress passed the Limitation Act "in an era before the corporation, with its limited shareholder liability, had become the standard form of business organization and before the present range of insurance protection was available." *University of Tex. Medical Branch v. United States*, 557 F.2d 438, 454 (5th Cir.1977), *cert. denied*, 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978).

13. As the parties have stipulated that the SEA HORSE was seaworthy on the day of the accident, this Court looks only to acts of negligence in making these two determinations.

14. The Pennsylvania rule originally applied only to collisions between ships; it now applies to all marine accidents. *Penzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir.1991); *see also Gele v. Chevron Oil Co.*, 574 F.2d 243 (5th Cir.1978) (applying Pennsylvania rule to improperly marked objects in navigable waters); *Pelican Marine Carriers v. City of Tampa*, 791 F.Supp. 845, 853 (M.D.Fla.1992) (applying Pennsylvania rule to allision between ship and sewer line), *aff'd sub nom. Pelican Marine v. City of Tampa*, 4 F.3d 999 (11th Cir.1993). Courts have applied the rule in actions brought under the Limitation Act. *E.g., In re Chevron Transp. Corp.*, 613 F.Supp. 1428, 1436 (M.D.Fla.

The "role reversal" that occurred on the SEA HORSE the day of the accident, in which Captain Meador abandoned his duties in order to scuba dive and Majer, the divemaster, assumed control of the boat, violated 46 U.S.C. § 8903 (1988), which requires a licensed captain to operate a vessel carrying paying passengers. This statutory violation invokes the Pennsylvania rule, shifting to the petitioners the burden of proving by a preponderance of the evidence both the lack of negligence or proximate cause and the lack of knowledge or privity in order to limit their liability under the Limitation Act.

## A. Negligence and Causation

Petitioners Adventure Bound and Smith have not proven a lack of negligence or causation sufficient to entitle them to exoneration from liability. The "role reversal," which violated federal admiralty law, constituted a negligent act that proximately caused the deaths of Seeds and Wentzel. While a ship owner need not prove that "its fault could not by any stretch of the imagination have any causal relation to the [accident], no matter how speculative, improbable, or remote," *Compania de Maderas de Caibarien, S.A. v. The Queenston Heights*, 220 F.2d 120, 122 (5th Cir.), *cert. denied sub nom. Esso Shipping Co. v. Compania de Maderas de Caibarien, S.A.*, 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736 (1955), the Pennsylvania rule burdens the owner with showing that the statutory violation did not cause or contribute to the loss. *Self Towing, Inc. v. Brown Marine Servs.*, 837 F.2d 1501, 1503 (11th Cir.1988) (citing *The Pennsylvania*, 86 U.S. at 136).

Evidence adduced at trial indicates that the section 8903 violation caused the accident. The delay occasioned by Meador donning his scuba gear resulted in the boat drifting out of position. Meador possessed the necessary experience to properly reposition the boat in relation to the current, and the familiarity with the SEA HORSE to ensure that it was in the proper gear. Majer, who was not wearing cumbersome diving gear, had the ability to observe the water lapping on board and deduce that the boat was in reverse. Had Majer, in his role as divemaster, stood at the back of the vessel while Meador, in his role as captain, stayed at the boat's controls, this accident could have been prevented.

Because the petitioners failed at trial to offer any credible evidence rebutting the presumption that the statutory violation caused the accident, this Court finds as a matter of law that Meador and Majer acted negligently in engaging in the "role reversal," proximately causing the deaths of Seeds and Wentzel. Accordingly, this Court denies the petition for exoneration from liability brought by Andre Smith d/b/a Adventure Bound Sports, and Adventure Bound Sports, Inc.

## B. Privity and Knowledge

The petitioners likewise may not limit their liability for the accident, since they have not met their burden of proving that they had no privity or knowledge of the "role reversal," the negligent act that proximately caused the accident. A court may not limit the liability of a ship owner who had privity or knowledge of the specific negligent act causing the loss. *Hercules Carriers*, 768 F.2d at 1574; *In re Brasea*, 583 F.2d 736, 738 (5th Cir.1978); *Farrell Lines*, 530 F.2d at 10. The privity or knowledge requirement serves "to afford protection to the physically remote owner who, after the ship breaks ground, has no effective control over his water-borne servants." *Tittle*, 544 F.2d at 756. To achieve this purpose, the Eleventh Circuit has recognized two manifestations of privity or knowledge: (1) " 'personal participation of the owner in some fault, or act of negligence causing or contributing to the loss' "; and (2) " 'personal knowledge or means of knowledge, of which [the owner] is bound to avail himself[,] of a contemplated loss, or a condition of things likely to produce or contribute to the loss, without adopting appropriate means to prevent it.' " *M/V SUNSHINE, II v. Beavin*, 808 F.2d 762, 763–64 (11th Cir.1987) (quoting *Lord v. Goodall, Nelson & Perkins*

1985), *aff'd in part and rev'd in part on other grounds sub nom. Self v. Great Lakes Dredge &*

*Dock Co.*, 832 F.2d 1540 (11th Cir.1987).

*S.S. Co.,* 15 F.Cas. 884, No. 8,506 (C.C.Cal. 1877)).[15] The privity or knowledge requirement thus has both an actual and a constructive component.

Courts have held corporate ship owners to a stricter standard than individual owners in determining whether they possessed privity or knowledge of a negligent act. *E.g., Hammersley v. Branigar Org.,* 762 F.Supp. 950, 958 (S.D.Ga.1991). An individual owner must personally possess privity or knowledge to be denied limitation of liability. *Coryell,* 317 U.S. at 411, 63 S.Ct. at 293; *Gibboney v. Wright,* 517 F.2d 1054, 1057–58 (5th Cir. 1975). In contrast, a court may impute to a corporate owner the privity or knowledge "of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred." *Coryell,* 317 U.S. at 410, 63 S.Ct. at 292; *see also Tittle,* 544 F.2d at 756 (considering whether "shore-based high-level management" of corporate owner had actual or constructive knowledge of likelihood of accident); *In re Sheen,* 709 F.Supp. 1123, 1133 n. 14 (S.D.Fla. 1989) ("[A]t some point in time the knowledge of the agent must be imputed to the corporation.").

A court must consider the individual facts and circumstances of each case when determining whether to impute the privity or knowledge of a corporate subordinate to the corporate owner. *Continental Oil Co. v. Bonanza Corp.,* 706 F.2d 1365, 1376 (5th Cir. 1983); *In re Kinsman Transit Co.,* 338 F.2d 708, 715 (2d Cir.1964), *cert. denied sub nom. Continental Grain Co. v. City of Buffalo,* 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965). The test of whether it is appropriate to impute privity or knowledge focuses on the managerial authority of the subordinate over the particular aspect of corporate business in which the accident occurred; a court, therefore, will look to the subordinate's function over his title. *See Coleman v. Jahncke Serv., Inc.,* 341 F.2d 956, 958 (5th Cir.1965) (looking to the privity of knowledge of corpo-

rate management or of "those to whom the authority of management has been delegated"), *cert. dismissed in part sub nom. Jahncke Serv., Inc. v. Greater New Orleans Expressway Comm'n,* 382 U.S. 967, 86 S.Ct. 525, 15 L.Ed.2d 463, *and cert. denied in part,* 382 U.S. 974, 86 S.Ct. 538, 15 L.Ed.2d 465 (1966); *In re Martell,* 742 F.Supp. 1147, 1153 (S.D.Fla.1990) ("[A]n owner may not escape liability by giving managerial functions to an employed person acting as its agent whether the person be corporate or otherwise.").

The privity or knowledge of Andre Smith, as chief executive officer of Adventure Bound Sports, Inc., clearly may be imputed to the corporation. The privity or knowledge of Meador and Majer, captain of the SEA HORSE and divemaster on the scuba diving excursion, respectively, may not be so imputed. While Meador and Majer clearly had supervisory authority over the excursion, this authority was confined to their non-managerial roles of captain and divemaster. Smith did not vest in Meador and Majer corporate managerial responsibilities when he placed them in charge of the excursion. In assessing the privity and knowledge of Adventure Bound, therefore, this Court may look only to the privity or knowledge of Smith. As to both the individual petitioner, Andre Smith, and the corporate petitioner, Adventure Bound, the availability of limited liability turns on Smith's privity or knowledge of the "role reversal."

The Court finds that Smith had actual knowledge of the "role reversal" between Meador and Majer, the negligent act that caused the casualties, because he tacitly authorized this practice. While Smith was not aware that Meador and Majer would engage in the role reversal on this particular diving trip, Smith's knowledge of and acquiescence in past instances of "role reversal" created an "unwritten policy" condoning the practice. The Eleventh Circuit has held that an owner who created an "unwritten policy" condoning the negligent actions of the ship's crew had

**15.** Technically, the first manifestation constitutes "privity" and second constitutes "knowledge." 3 *Benedict on Admiralty* § 41 (7th ed. 1981). While courts in other jurisdictions have drawn this academic distinction, *see, e.g., Zeringue v.*

*Gulf Fleet Marine Corp.,* 666 F.Supp. 860, 863 (E.D.La.1986), this Court follows the Eleventh Circuit's lead in employing the phrase "privity or knowledge" to encompass both manifestations without distinction.

privity or knowledge of those actions when they caused loss or injury. *Hercules Carriers,* 768 F.2d at 1576. Furthermore, the Eleventh Circuit has stated that "[n]othing could better illustrate an owner's privity and knowledge than its direction to its crew to disregard [a regulation]." *Id.* While Smith did not *instruct* Meador and Majer to violate the federal law requiring a licensed captain to operate a ship at all times when it is carrying paying passengers, his acquiescence to his crew's open practice of violating the law authorized such violation. This too presents a clear illustration of an owner's privity or knowledge of a negligent act.

Because Andre Smith had actual privity or knowledge of his crew's practice of "role reversal" while conducting scuba diving trips with paying passengers aboard, in violation of federal law, this Court must deny the petition for limitation of liability brought by Andre Smith d/b/a Adventure Bound Sports. Furthermore, because this Court imputes Smith's privity or knowledge to his corporation, this Court also must deny the petition for limitation brought by Adventure Bound Sports, Inc.

## II. Smith's Personal Liability for Adventure Bound's Negligence

■ This Court holds that it can pierce the corporate veil of Adventure Bound Sports, Inc. and impose liability on Andre Smith individually for the negligence of Adventure Bound.

■ Because a corporation possesses a legal existence separate and apart from that of its officers, the mere operation of a corporate business will not render an individual personally liable for corporate acts. *Amason v. Whitehead,* 186 Ga.App. 320, 367 S.E.2d 107, 108 (1988). The fact that a single person owns a corporation will not affect this cardinal rule, even if that sole owner uses and controls the corporation to promote his personal ends. *Id.*

■ To "pierce" this corporate veil and impose personal liability on corporate owners, a claimant must present evidence of abuse of the corporate form by showing that the owner "disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control." *Earnest v. Merck,* 183 Ga.App. 271, 358 S.E.2d 661, 663 (1987); *Heyde v. Xtraman, Inc.,* 199 Ga.App. 303, 404 S.E.2d 607, 610 (1991) (citing *Earnest*); *Amason,* 367 S.E.2d at 108 (citing *Earnest*). Georgia law also applies the concept of piercing the corporate veil to remedy injustices that arise where a party "has overextended his privilege in the use of a corporate entity in order to defeat justice, perpetuate fraud or to evade contractual or tort responsibility." *Kelley v. Austell Bldg. Supply, Inc.,* 164 Ga. App. 322, 297 S.E.2d 292, 297 (1982).

The claimants produced sufficient evidence at trial to pierce the corporate veil of Adventure Bound, based both upon the theory of commingled assets and upon the theory of evasion of tort liability. The claimants submitted evidence that Smith did not operate Adventure Bound as an entity separate and distinct from himself. Despite Adventure Bound's corporate status, Smith operated the business as a sole proprietorship. Further, the evidence clearly suggests that Smith reinstated the corporate status of Adventure Bound solely to evade liability in the instant limitation proceeding.[16] This Court, therefore, will hold Smith personally liable for the negligence of Adventure Bound Sports, Inc.

## III. Contributory Negligence of Seeds and Wentzel

■ While the Court deems the captain and the divemaster of the SEA HORSE to have been negligent in engaging in the practice of "role reversal," resulting in the deaths of Seeds and Wentzel, the Court also attributes some negligence to the decedents. The decedents' negligence will temper the

---

**16.** Undisputed evidence indicates that Adventure Bound was incorporated in 1979 and administratively dissolved in 1988. Smith closed the dive shop in September 1989, and conducted no further business under the name "Adventure Bound Sports" prior to reinstating the corporate status on November 15, 1989. Smith and Adventure Bound filed the instant petition December 5, 1989.

liability to which petitioners are subject under DOHSA.

■ Under DOHSA, a decedent's contributory negligence is not a complete bar to recovery, but the degree of such contributory negligence will reduce a plaintiff's recovery. 46 U.S.C.A.App. § 766 (1975).[17] As such, section 766 adopts in DOHSA actions a rule of pure comparative negligence. *See United States v. Reliable Transfer Co.*, 421 U.S. 397, 408 n. 12, 411, 95 S.Ct. 1708, 1714 n. 12, 1715, 44 L.Ed.2d 251 (1975) (referring to section 766 as rule of comparative negligence, and adopting similar rule as general rule in admiralty cases); *United States v. DeVane*, 306 F.2d 182 (5th Cir.1962) (employing term "comparative negligence" in analyzing DOHSA case under section 766); *Martell*, 742 F.Supp. at 1154 (denying petition for limitation of liability despite finding claimant to be 63% negligent); *Martinez v. Puerto Rico Marine Management*, 755 F.Supp. 1001, 1008 (S.D.Ala.1990) (referring to section 766 as "[t]he law of comparative negligence [that] applies in DOHSA"); *DeRamos v. Vulcania S.S. Co.*, No. 82 Civ. 8268, 1985 WL 2240, at *3 (S.D.N.Y. Aug. 1, 1985) ("Under DOHSA ... [t]he Court can apply admiralty rules of comparative negligence to take into consideration the degree of negligence attributable to the deceased.").

■ The petitioners, as defendants in the DOHSA action, must establish the decedents' contributory negligence by a preponderance of the evidence to obtain a reduction in liability. *Kuntz v. Windjammer "Barefoot" Cruises*, 573 F.Supp. 1277, 1283 (W.D.Pa. 1983), *aff'd*, 738 F.2d 423 (3d Cir.), *and cert. denied*, 469 U.S. 858, 105 S.Ct. 188, 83 L.Ed.2d 121 (1984). Furthermore, they must show that this contributory negligence was a concurrent proximate cause of their deaths. *See DeVane*, 306 F.2d at 187 ("Comparative negligence [in DOHSA action] relates to that negligence which is the proximate concurring cause of the injury.").

A preponderance of the evidence adduced at trial shows that Seeds and Wentzel were contributorily negligent and that their negli-

gence was a proximate cause of their deaths, although it did not supersede the negligence of the SEA HORSE crew. A factually similar case, *Kuntz v. Windjammer "Barefoot" Cruises*, addressed the distinction between a concurrent proximate cause and a superseding cause. *Kuntz*, 573 F.Supp. at 1282–83. In *Kuntz*, the Western District of Pennsylvania found a scuba diving instructor negligent for, *inter alia*, failing to pay proper attention to novice divers during an open water dive, and held this negligence to be the proximate cause of a student's death. *Id.* The *Kuntz* court, however, also found the decedent contributorily negligent for ingesting a significant amount of alcohol and smoking marijuana the night before the dive, and reduced the recovery by 50% under section 766. *Id.* at 1282. The court explained:

[W]e find, by a preponderance of the evidence, that [the decedent] contributed to her own death ..., but, had [the instructor] properly supervised [the decedent], ... this incident would not have occurred.

On the other hand, we find that, had [the decedent] not ingested the chemicals which produced the diminished motor capacity, she may have been better able to respond to the unsupervised conditions that confronted her due to the negligence of [the instructor].

*Id.* at 1283. The *Kuntz* court, as a result, held that the decedent's negligence was a substantial factor but not the sole or superseding cause of her death, since, despite the decedent's negligence, the instructor could have prevented the accident through non-negligent behavior, and since the decedent's negligence "was not so extraordinary as not to be reasonably foreseeable." *Id.*

As occurred in *Kuntz*, the conduct of Seeds and Wentzel was a substantial factor in their deaths, but did not supersede the negligence of Meador and Majer in causing their deaths. The testimony of Lapp at trial showed that Seeds and Wentzel formed a dangerous, three-person buddy team in which one diver

---

**17.** Section 766 provides: "In suits under this chapter the fact that the decedent has been guilty of contributory negligence shall not bar recovery, but the court shall take into consideration the degree of negligence attributable to the decedent and reduce the recovery accordingly." *Id.*

was to separate from the other two, contrary to PADI procedures. Lapp's testimony also indicated that Seeds and Wentzel anticipated equalization difficulties but did not disclose them to Majer, the divemaster, instead relying more heavily on Lapp in performing their dive. Had Seeds and Wentzel followed proper PADI procedure, they might have survived the incident under the guidance of Majer, the divemaster, or Lapp, a highly-experienced diver.

Despite the contributory negligence of Seeds and Wentzel, however, their deaths would not have occurred had Majer and Meador not engaged in the "role reversal." If Meador had remained in his role as captain, he likely would have properly repositioned the SEA HORSE in relationship to the current and, being experienced with the nuances of the SEA HORSE transmission, would have assured that the engine idled in neutral rather than reverse. If Majer had remained in his role as divemaster, he would have given the "go" command and would have stood at the rear of the boat to watch the dive. Because he was not wearing scuba gear, Majer would have noted the water splashing onto the deck that indicated that the engine was in reverse. As a result, Seeds and Wentzel would not have dived into a current that pushed them up into an active propeller, and would have survived.

The Court therefore finds the "role reversal" to be the proximate cause of the accident, and the decedents' conduct to be a significant contributing factor to their deaths. Accordingly, the Court attributes sixty-six and two-thirds percent of the fault in the incident to Meador and Majer, and thirty-three and one-third percent of the fault to Seeds and Wentzel.

## CONCLUSION

As discussed in the above Findings of Fact and Conclusions of Law, the Court finds that the crew of the SEA HORSE acted negligently by allowing the captain to scuba dive on a trip with paying customers, leaving the divemaster, an unlicensed operator, in charge of the vessel and unable to perform his divemaster responsibilities. Furthermore, the Court finds that this negligence proximately caused the deaths of two divers, Warren Seeds and Paul Wentzel, but that negligent actions by Seeds and Wentzel contributed to their deaths in the amount of thirty-three and one-third percent. The Court also finds that Andre Smith d/b/a Adventure Bound Sports, the individual owner of the SEA HORSE, and Adventure Bound Sports, Inc., the corporate owner of the SEA HORSE, had knowledge and privity of the crew's negligence.

Accordingly, the Court **DENIES** the Petition for Exoneration from or Limitation of Liability of Adventure Bound Sports, Inc. and Andre Smith d/b/a Adventure Bound Sports. The Court will conduct the damages phase of the trial at 10:00 a.m. on Monday, December 13, 1993.